**DECLARATION OF RICHARD C. VASQUEZ IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. STANTON C. HONIG AND DR. JOSEPH SERLETTI**

# EXHIBIT: 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

KAMAL RAVIKANT,

                         Plaintiff,

- against -                                      Civil Action No. 21-CV-04758

CHRISTINE H. ROHDE, M.D., JOSEPH P.      Hon. Magistrate Judge Ona T.
ALUKAL, M.D., JARROD BOGUE, M.D.,       Wang
COLUMBIA DOCTORS FACULTY
PRACTICE GROUP OF THE COLUMBIA
UNIVERSITY IRVING MEDICAL CENTER
AND THE NEW YORK AND
PRESBYTERIAN HOSPITAL,

                         Defendants.

_____ x


# EXPERT REPORT OF STANTON C. HONIG, M.D.


Dated: December 5, 2023

                                                           Stanton C. Honig, M.D.

1

At the request of counsel for Defendants Christine H. Rohde, M.D., Joseph P. Alukal, M.D., Jennie Rovano, R.N., The New York and Presbyterian Hospital, and The Trustees of Columbia University in the City of New York, I hereby submit the following expert report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

## QUALIFICATIONS

Enclosed please find my CV with details of all qualifications.

I am currently a Professor of Urology at Yale University School of Medicine and the Division Chief, Sexual and Reproductive Medicine, Department of Urology, Yale School of Medicine. My practice is dedicated to the diagnosis and treatment of sexual and reproductive medicine. I am a trained microsurgeon and sexual medicine specialist. I am fellowship-trained in Male Reproductive and Sexual Medicine and Surgery, and I have been in practice since 1993.

Further, I am the Past President of the Society for the Study of Male Reproduction, and the Past President of the Society of Male Reproduction/Urology. I am also the course leader at Yale Medical School in the "Across the Lifespan" module of teaching, which includes a lecture to the medical students on "Physiology of the Penis and Erectile Function", and case presentations on Pathophysiology of Erectile Dysfunction. We have hosted 3 national seminars on Men's Health, and also served as the course director for the Yale Bulldog debates this year, which featured topics on Sexual and Reproductive Medicine.

I am also the past Chairman of the Sexual and Reproductive Council of the Urology Care Foundation, a patient directed subsection of the American Urological Association.

## FEES

I am being compensated at $700/hour for my work on this case.

## PRIOR EXPERT TESTIMONY

In the past four years, I have not testified as an expert witness.

## MATERIALS CONSIDERED

- NYPH Hospital Records
- NYPH Radiology Studies
- Dr. Alukal Office Records
- Dr. Rohde Office Records
- Dr. McClure Office Records
- Dr. Shafizadeh Office Records
- Dr. Madala Office Records
- Dr. Lipman Office Records
- Dr. Gerardi Office Records

2

- Dr. Campanille Office Records
- Dr. Cook Office Records
- Dr. Abramson Office Records
- Mount Sinai Office Records
- Dr. Rachko Office Records
- Dr. Young Office Records
- Plaintiff's Deposition Testimony (EBTs on 11/8/22 and 11/9/22)
- Dr. Alukal Deposition Testimony (EBTs on 12/15/22 and 1/20/23)
- Dr. Rohde Deposition Testimony (EBT on 12/16/22)
- Dr. Jarrod Bogue Deposition Testimony (EBT on 12/22/22)
- Nurse Rovano Deposition Testimony (EBT on 12/21/22)
- San Diego Sexual Medicine/Dr. Goldstein Records
- Alvarado Hospital Records
- Dr. Rose Hartzell Psych Records
- Dr. Goldstein Expert Report

## **FACTUAL SUMMARY**

### **Background:**

Erectile dysfunction is a common problem in men aged 40-70. There are many etiologies for this condition, including vascular, neurogenic, endocrinologic and situational (psychogenic). In many cases, there may be a combination of two of these etiologies that can be responsible for erectile dysfunction.

In most cases, if the history is straightforward, standard of care treatments are offered without a detailed evaluation. These treatments include oral medications such as Viagra, Cialis (sildenafil, tadalafil), penile injection therapy, vacuum erection therapy, and/or a penile implant. More recently, shock wave therapy has been shown to have a role in reversing erectile dysfunction as well.

In certain cases, a patient wants to better understand the "cause" of the problem. A duplex doppler ultrasound can be performed in such cases with intracavernosal injection. A duplex doppler study may also be performed in patients where there may appear to be a pure case of arterial flow dysfunction, and no corporal veno occlusive dysfunction. A pure arterial inflow problem would be present if the end systolic velocities of the cavernosal artery are low, and the end diastolic velocity is zero. If an isolated arterial inflow problem is identified, it is reasonable to proceed with an angiogram to identify if there is a site-specific abnormality. This would determine if a patient is a reasonable candidate for a penile revascularization procedure.

The American Urologic Guidelines on Erectile Dysfunction statement regarding penile revascularization stated in 2018 as follows:

> For young men with ED and focal pelvic/penile arterial occlusion and without documented generalized vascular disease or veno-occlusive dysfunction, penile arterial reconstruction may be considered. (Conditional Recommendation; Evidence Level: Grade C).

3

There is no mention of the procedure being experimental. Based on the above guideline, and as will be further explained below, Mr. Ravikant was a reasonable candidate for the procedure and Dr. Alukal and Dr. Rohde had appropriate credentials to perform the operation.

**Preoperative Evaluation**

Mr. Ravikant was seen pre-operatively with Dr. Alukal, in August 2019. Dr. Alukal reviewed prior notes pertaining to the patient, and took a history and physical examination in standard fashion. As stated by Mr. Ravikant at his deposition, the patient had already tried multiple nontraditional treatments, including shock wave therapy (considered experimental at the time of treatment), as well as many supplements including citrulline and L-arginine. The patient's reported history of erectile dysfunction was mixed- sometimes with problems with getting an erection and sometimes maintaining an erection. This is typically due to a combination of blood flow issues and situational anxiety. The patient also used Cialis with intermittent success. He also tried exosome injections, PT141 or bremonalitide (melanocortin SQ), and regenerative medicine therapy with plasma rich protein. All of these are non-standard-of-care options. He appeared to want an operation that would "cure" his erectile dysfunction. After Mr. Ravikant underwent a physical examination, Dr. Alukal reviewed all prior documents and recommended a repeat Duplex doppler ultrasound with intracavernosal injection. The interpretation of the prior ultrasound was non-diagnostic, since the patient was injected with a low dose of Trimix, and had an incomplete erection. Dr. Alukal also reviewed the angiogram performed by Dr. McClure on June, 2019 which revealed that the right proximal penile artery had an abrupt cut off and no visualization of the cavernosal artery. This is the typical abnormality seen in a site-specific perineal injury and artery blockage.

On September 3, 2019, Dr. Alukal performed the repeat duplex doppler which revealed decreased peak systolic velocity and end diastolic velocity of zero. This is consistent with cavernosal artery insufficiency and normal veno occlusive dysfunction.

Dr. Alukal and Dr. Rohde, both trained microsurgeons consulted and reviewed the risks, benefits and alternatives of a penile revascularization including but not limited to infection, bleeding, ugly scarring, graft failure, insufficient flow, priapism, hyperemia and need for further procedures. All questions were answered pre-operatively.

**Procedures**

On October 1, 2019, the patient underwent an uncomplicated penile revascularization procedure at The New York and Presbyterian Hospital with Dr. Alukal and Dr. Rohde. During the procedure, Dr. Alukal mobilized the inferior epigastric artery laparoscopically as he has done previously. Dr. Rohde then performed the anastomosis, which was under no tension at the end of the procedure.

The following day on October 2, 2019, the patient got out of bed and developed a swollen scrotum. The team was notified and a prompt response by the urology and plastic surgery team was initiated. Dr. Rohde then proceeded emergently back to the operating room. The team saved Mr. Ravikant's

life by controlling the bleeding, and then was faced with the reasonable option of redoing the anastomosis to a different site. This procedure and anastomosis were standard of care treatment for a penile revascularization procedure.

**Post-Operative Course**

The patient's post operative course was as expected.

Unfortunately, the procedure did not relieve Mr. Ravikant's erectile dysfunction.

In March, 2021, the patient sought care with Dr. Irwin Goldstein who performed a duplex ultrasound with intracavernosal injection. The patient had a poor response to intracavernosal injection. Dr. Goldstein recommended the placement of a penile implant.

Mr. Ravikant had a successful placement of a penile prosthesis, that appeared to be complicated by an infection that apparently cleared with antibiotics, which is unusual. However, Mr. Ravikant now has a functioning implant and can perform sexually.

**STATEMENT OF OPINIONS**

Mr. Ravikant was a reasonable candidate for a penile revascularization. The patient met reasonable criteria for the penile revascularization as described by both the American Urological Association ("AUA") guidelines as well as papers written by Dr. Goldstein.

This is the American Urological Association ("AUA") Guidelines comment on Penile Revascularization: (Guideline 21) Burnett AL, Nehra A, Breau RH et al: Erectile dysfunction: AUA guideline. J Urol 2018; **200**: 633.

> 21. For young men with ED and focal pelvic/penile arterial occlusion and without documented generalized vascular disease or veno-occlusive dysfunction, penile arterial reconstruction may be considered. (Conditional Recommendation; Evidence Level: Grade C)

Contrary to Dr. Goldstein's claims, there is no mention by the AUA of this procedure being experimental. Rather, the guidelines state that it should be performed by only a handful of highly skilled and experienced surgeons with a track record of success in a center of excellence. Dr. Alukal is a trained microsurgeon at a center of excellence for sexual medicine, who notably trained under Dr. Goldstein, and meets this criteria. Dr. Alukal also asked for help from Dr. Rohde who has additional microsurgical training. The surgeon is notably not required to tell the patient his academic background above and beyond his specific expertise in Sexual and Reproductive Medicine, as this is the focus of his practice. Based on the above guideline, Mr. Ravikant was a reasonable candidate for the procedure, and Dr. Alukal and Dr. Rohde had appropriate credentials to perform the operation, as also further explained below.

Dr. Goldstein's chief contention is that this patient had corporal veno occlusive dysfunction, and not arteriogenic only erectile dysfunction, and that this made the penile revascularization procedure contraindicated. I disagree. More likely than not, this patient had situational anxiety

5

induced "venous leak," not corporal veno occlusive dysfunction, which does not make the procedure contraindicated as further explained below.

While the patient did not have a full erection during his duplex doppler ultrasound performed by Dr. Shafizadeh, in March, 2019, which Dr. Goldstein points to in efforts to demonstrate that this patient had corporal veno occlusive dysfunction, this could have been due to situational anxiety-induced erectile dysfunction. Indeed, the quality of the erection that occurs in a doctor's office during a diagnostic test is very variable based on patient anxiety. A patient can "lose an erection" due to anxiety-induced increased sympathetic tone." This is not uncommon at the time of a duplex ultrasound done in the office, and can occur even with redosing with high strength trimix medication. We see this in the office all the time. Here, this patient was very anxious, depressed, and all of this situational anxiety can contribute to poor erections and/or loss of erections due to incomplete blockage of subtunical venules. Sexuality was notably also a critically important part of Mr. Ravikant's life, which could have contributed to increased anxiety levels. Such situational anxiety is very common in my practice, and of all sexual medicine specialists. Therefore, it is not uncommon to get an incomplete erection or lose it after measurements of velocity are recorded.

Further, the lack of any reported trauma did not preclude an occlusive arterial pathology in this patient, as Dr. Goldstein suggests. Indeed, occlusive arterial pathology is only *presumed* secondary to an episode of blunt perineal trauma, such as bicycle riding. Yet, notably, many patients who have pure cavernosal artery inflow problems do not have a clear history of perineal trauma. Not having a history of trauma is not a contraindication to penile revascularization.

Dr. Goldstein also states that patients with arteriogenic-only erectile dysfunction will describe a slow-filling erection. Typically, a patient with arteriogenic-only erectile dysfunction will complain of a poorly spontaneous erection. However, it is difficult to make a diagnosis based upon such complaints alone, as an erection can be affected by decreased inflow, incomplete blockage of subtunical venules, and smooth muscle contraction and relaxation. Smooth muscle contraction and relaxation can also be affected by situational anxiety due to increased sympathetic tone, and not necessarily abnormal smooth muscle of the penis.

Here, Dr. Alukal confirmed that Mr. Ravikant did not have corporal veno-occlusive dysfunction by the duplex doppler study that he performed, on September 3, 2019. Per Dr. Alukal's September 3rd duplex doppler, the peak systolic velocities were low (consistent with cavernosal artery insufficiency) and the end diastolic velocity was zero (consistent with normal veno occlusive function).

The specifics of the "history" taken by Dr. Alukal was standard of care for any sexual medicine specialist as well.

With respect to contraindications to the procedure, notably the patient did not have acquired peripheral vascular disease either. He had hypertension and high cholesterol, neither of which required medication at the time of his evaluation by Dr. Alukal. There was simply no evidence of generalized or diffuse vascular disease that would make this procedure contraindicated.

There was also no clear neurogenic issues, and his low testosterone was treated and did not change his erectile function.

Nor was the plaintiff's age of 48 years at the time of surgery a contraindication to the procedure. Indeed, Dr. Goldstein himself stated that the procedure was not contraindicated in patients under the age of 55 years, per his article. **Sohn M, Hatzinger M, Goldstein I, and Krishnamurti S. Standard operating procedures for vascular surgery in erectile dysfunction: Revascularization and venous procedures. J Sex Med 2013;10:172–179.**

Many young patients also have concomitant situational anxiety and this is not a contraindication to penile revascularization. Many times, this will resolve after the underlying physical problem is resolved.

Ultimately, this patient was a reasonable candidate for penile revascularization. He met the criteria set by the American Urological Association Guidelines for penile revascularization. He was less than 55 years old, a non-smoker, a non-diabetic, and had no clear corporal veno-occlusive dysfunction. He had cavernosal artery insufficiency, and most likely incomplete smooth muscle relaxation due to situational anxiety.

Dr. Goldstein also discussed "grey scale changes in the corpora" as findings consistent with corporal veno occlusive dysfunction. Grey scale ultrasound findings are however not "standard of care" evaluation for collagen tissue that accumulate in erectile tissue. Dr. Goldstein's reference is an abstract only (published long after this case occurred, which is also not peer reviewed, a requisite to quote literature).

Dr. Goldstein also contends that **Dr. Alukal fell below the standard of care by representing himself to Mr. Ravikant as an expert in the field of penile revascularization surgery**. However, Dr. Alukal is a board-certified urologist and a fellowship-trained microsurgeon and, in fact, trained under Dr. Goldstein, and performed many penile revascularization procedures in this training. Dr. Rohde is also a plastic surgeon with microvascular experience. Given this, both were completely competent to perform the penile revascularization procedure.

Dr. Goldstein also stated that the patient was not offered penile injection therapy. However, this is not accurate. Rather, Dr. Alukal specifically testified that he did discuss the option of having penile injection therapy with the patient, but cautioned him that it may never work. In any event, the patient did not respond to penile injection therapy in the office and, therefore, he would not be a great candidate for this treatment. Further, the patient was seeking a solution to the problem not a mere ongoing treatment. As such, Dr. Alukal did not fall below the standard of care here, even if he had not discussed the option (which was not the case).

Dr. Alukal also appropriately performed the penile revascularization procedure, with the inferior epigastric artery anastomosed to the dorsal artery. Dr. Goldstein himself has supported this way of performing a penile revascularization procedure. **Sohn M, Hatzinger M, Goldstein I, and Krishnamurti S. Standard operating procedures for vascular surgery in erectile dysfunction: Revascularization and venous procedures. J Sex Med 2013;10:172–179.**

The inferior epigastric artery was harvested by Dr. Alukal in an appropriate fashion. Dr. Alukal also had an adequate length of the epigastric artery at the end of the procedure. There is simply no evidence that there was insufficient length of the donor inferior epigastric artery, or that the anastomosis was under tension at the end of the case. While Dr. Rohde's surgical note initially noted tension on the anastomosis, at the end of the procedure it was clearly documented that there was no tension on the anastomosis.

Dr. Alukal also appropriately performed the penile revascularization procedure via a laparoscopic approach, to minimize the size of the incision and the post-operative pain. Dr. Alukal notably also had prior experience in performing the procedure laparoscopically.

Dr. Goldstein also suggests that a "longer" time in the operative room somehow correlates to the procedure not having been performed correctly. There is simply no merit to this, and there is no evidence whatsoever that the procedure was improperly performed. The use of robotic technology for this surgery could easily increase the operating room time. In addition, the coordination of two surgeons sometimes complicates how long the procedure takes. Further, the length of the procedure is also determined by the anesthesia team which may or may not require more or less time for anesthesia induction and wake up.

One day after surgery, Mr. Ravikant experienced a post-operative bleeding issue, as specifically described in the operative risks as noted in Dr. Rohde's operative consent and chart. This was an acute complication, and can occur in any surgical procedure. It is a known and accepted complication of such surgery.

The surgical team promptly rushed Mr. Ravikant back to the operating room for the bleeding, and saved his life. The fact that the plaintiff's anastomosis was disrupted does not mean that there was increased tension on the anastomosis. This could have been disrupted by any action by the patient moving around in the bed, or getting up in the post-operative period.

There is also no merit to Dr. Goldstein's claim that Dr. Alukal fell below the standard of care when he "abandoned" the patient as he was not present when the patient was rushed back to the OR for emergency surgery, and was therefore not present to help make appropriate decisions. It is not the standard of care that the surgeon must be at, or must call, the recovery room to check on the status of a patient continuously. Indeed, most surgeries go as planned and do not require any calls to the recovery room. As such, once the surgery is complete, the surgeon will continue his daily activities which includes other surgery, see patients in the clinic, or work on paperwork. Dr. Alukal left the hospital as most surgeons do post-op, and returned in a timely fashion (given he was in a clinic a distance away) when he was made aware of the complication that occurred. In the meantime, the patient was treated in a timely and appropriate manner by Dr. Rohde, who was one of the operating room surgeons for the original surgery. She was immediately present to sort out, treat, and save the life of this patient. Further, Dr. Rohde asked that urologist, Dr. Brandes, step in until Dr. Alukal arrived.

Dr. Goldstein also wrongfully alleges that it was a departure for Dr. Rohde to perform an elective procedure upon the patients' return to the Operating Room for the bleed. This is also inaccurate. Rather, Dr. Rohde appropriately first performed the emergency surgery to stop the patient's bleed,

8

and only thereafter proceeded with the patient's wishes for further elective surgery in efforts to treat his underlying condition of erectile dysfunction via a further revascularization procedure.

Contrary to Dr. Goldstein's claim, there was no evidence during the second surgery that the donor artery from the first surgery was too short. Simply because Dr. Rohde harvested the saphenous vein for the second procedure, does not somehow prove or suggest the donor artery was too short. Rather, many times when an artery is harvested, it may contract and not give adequate length for a second anastomosis. It was therefore sound surgical judgment to harvest the saphenous vein to perform an anastomosis that was again tension free.

With respect to the artery to vein anastomosis for flow into the corpus cavernosum, there have been multiple recommendations over time regarding the use of artery to artery and artery to vein via retrograde flow into the corpus cavernosum to increase blood flow. Notably, Dr. Goldstein, in his paper from 2013, describes the different techniques that are utilized for penile revascularization surgery, which specifically supports the artery to vein procedure that was performed by Dr. Rohde in an attempt to salvage treatment of the patient's erectile dysfunction. **Sohn M, Hatzinger M, Goldstein I, and Krishnamurti S. Standard operating procedures for vascular surgery in erectile dysfunction: Revascularization and venous procedures. J Sex Med 2013;10:172–179.**

Dr. Rohde's surgery was physiologic and is listed as an accepted procedure by Dr. Goldstein in his 2013 article. **Sohn M, Hatzinger M, Goldstein I, and Krishnamurti S. Standard operating procedures for vascular surgery in erectile dysfunction: Revascularization and venous procedures. J Sex Med 2013; 10: 172–179.**

Ultimately, there are risks with all procedures, including different types of revascularization. There was no glans necrosis or other long term penile complications here from this salvage anastomosis in attempt to restore Mr. Ravikant's erectile function.

Dr. Goldstein also alleges that Dr. Rohde fell below the standard of care by performing this surgery, and by not discussing the potential consequences with Mr. Ravikant. He also alleges that Dr. Alukal fell below the standard of care by supporting this elective artery to vein procedure. At the outset, the specific technicalities of the procedure and how it is performed are not required to be discussed with a patient under the standard of care. Rather, what is discussed with the patient under the standard of care is the procedure itself along with a discussion regarding the risks, benefits, and alternatives of the procedure. In addition, the October 2, 2019 procedure was an emergency procedure and Dr. Rohde saved Mr. Ravikant's life by controlling the bleeding in a timely fashion. Once this was done, it was appropriate for Dr. Alukal to support the salvage revascularization procedure.

Dr. Goldstein also lists many purported complications related to the October, 2019 surgeries, all of which are either known risks of penile or scrotal procedures or are unrelated to the surgery performed. For instance, complaints of post-operative pain in the penis and scrotum is typical after any penile or scrotal surgery. Abdominal pain could have been a result of the procedure to mobilize the inferior epigastric artery. Risk of narcotic addiction is also a typical fear of any person who takes narcotics, either short term or long term. The patient's issues with urination are however not likely related to the surgeries performed, as they did not involve the urethra, bladder or prostate

9

area that affects urination. There is also absolutely no risk of fertility issues related to this surgery either. If Mr. Ravikant was concerned about this, he could have also mentioned it to Dr. Alukal, who would have then have allayed his fears. It is also not clear whether the patient has a hernia, and whether it is related to the surgical procedure at issue. Notably, Dr. Alukal noted preoperatively that the patient had prior bilateral hernia scars which can recur, which would be unrelated to the surgery here. Further, multiple trocar insertions are standard of care to perform laparoscopic surgery, regardless of whether the procedure was performed laparoscopically or open, which carries the risk of a hernia, as would any implant surgery that places the implant in the space of Retzius (as described in one operative note by Dr. Goldstein).

Any worsened erectile dysfunction when the patient presented to Dr. Goldstein, on March 12, 2021, was also not likely related to post operative complications from his prior surgery, as the complications which occurred would not affect native inflow. Nor can Dr. Goldstein ever demonstrate otherwise, as Dr. Goldstein did not measure penile sensation and length before and after the October, 2019 surgeries, nor did he examine his glans or right testes prior to the October, 2019 surgeries.

With respect to Dr. Goldstein's implant placement surgery, performed on April 21, 2021, it is commonplace to put the reservoir of the implant in the submuscular space in a case like this, which we encounter all the time in penile implant surgery. In fact, it has become the standard of care in these cases. Dr. Goldstein also did not make an incision to examine the bladder. Therefore, his comment that Mr. Ravikant's bladder is encased in scar is based on no data, and it is pure conjecture to state that this is responsible for his post operative bladder symptoms, which eventually resolved. An appropriately placed submuscular reservoir is not typically palpable. There are other places to put a reservoir, such as in the high retroperitoneum or to possibly use a two (2)-piece inflatable penile prosthesis if Dr. Goldstein thought that it would be "frustrating and bothersome" to the patient. Scarring in the scrotum is also commonplace after surgery, and yet Dr. Goldstein was able to place the implant appropriately in the penis and scrotum, despite suboptimal placement of the reservoir in the submuscular space. Further, while some scars are bigger than others, the nature of the scar is not usually a result of poor surgical technique. How a scar is perceived is more a function of patient perception. Dr. Rohde mentions poor cosmetic result ("ugly scarring"), in the list of complications of the surgery.

Dr. Goldstein also discusses the findings of the corporal biopsies taken during his operation for placement of the penile implant. Notably, there was no consent from the patient to perform these corporal biopsies. In fact, doing biopsies of the corpus cavernosum is not standard of care treatment. The papers that address the histology of the corpus cavernosum are based on a small number of patients, and were published over 20 years ago and have no value in assessing corporal veno occlusive dysfunction as they do not clearly correlate with patient findings. Further, they do not identify any contraindication to penile revascularization. Penile biopsies are simply not used as a diagnostic tool to determine corporal veno occlusive dysfunction now or at the time of Mr. Ravikant's operation. In addition, there are no corporal biopsies before and after the penile revascularization to show that these changes were present at the time of the penile revascularization. regardless. Therefore, Dr. Goldstein's opinion on this is pure conjecture.

Dr. Goldstein also states that he found during his surgery that the corpora cavernosa were severely scarred. The prior procedures are however not likely to have caused such scarring within the corpus cavernosa. In addition, despite Dr. Goldstein's note that the corpora were fibrotic, his operation was notably completed without difficulty. If extensive fibrosis was actually present, different instruments would usually be necessary to perform the operation even in experienced hands. These include cavernotomes and/Rosselli instruments, or the use of Metzenbaum scissors to cut through fibrotic tissue. There was however no mention in the operative note by Dr. Goldstein that any such instruments were utilized. In fact, there is nothing in the operative note to suggest it was a difficult procedure.

There is also an operative note in the Alvarado Hospital notes, and also another operative summary in Dr. Goldstein's notes. There appears to be a difference in where the penile implant reservoir was placed in the two notes. In the notes from Alvarado Hospital, the reservoir was placed in the right space of retzius despite "extensive scarring." In a separate note from Dr. Goldstein's office notes, it states that the right space of Retzius was too fibrotic and could not be safely entered. Thus, the reservoir was placed above the transversalis fascia and below the transversus abdominal muscle. Which one was it?

The patient appeared to have an implant infection 4 weeks post operatively. In patients with prior scrotal surgery and prior penile implant surgery, there may be a higher rate of oozing, However, there is no mention in the implant case of persistent "oozing" or major surgical difficulties to suggest that this was the case. I am not aware of any published literature that shows that prior scrotal scarring is a risk factor for a higher rate of infection with a penile implant either. Scarring in the area of the reservoir placement is common from prior hernia repairs and robotic prostatectomies, and there is no higher risk of infection in these cases.

In summary, Mr. Ravikant was a reasonable candidate for the penile revascularization procedure as described by the AUA Guidelines on Erectile Dysfunction and Dr. Goldstein's paper. Dr. Alukal and his team had the appropriate expertise to perform the surgery. The patient had a life-threatening bleeding complication, which can occur during any surgery and his life was saved by a team that acted in a timely and professional nature to treat the patient's complication and try to re-route the blood flow to the penis in an appropriate fashion.

All of my opinions herein are rendered to a reasonable degree of medical certainty.

Dated: December 5, 2023

Stanton C. Honig, M.D.

11