**DECLARATION OF RICHARD C. VASQUEZ IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. STANTON C. HONIG AND DR. JOSEPH SERLETTI**

# EXHIBIT: 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
KAMAL RAVIKANT,

                         Plaintiff,

   - against -                                   Civil Action No. 21-CV-04758

CHRISTINE H. ROHDE, M.D., JOSEPH P.         Hon. Magistrate Judge Ona T.
ALUKAL, M.D., JARROD BOGUE, M.D.,          Wang
COLUMBIA DOCTORS FACULTY
PRACTICE GROUP OF THE COLUMBIA
UNIVERSITY IRVING MEDICAL CENTER
AND THE NEW YORK AND
PRESBYTERIAN HOSPITAL,

                        Defendants.
---------------------------------------------------------------- x


# EXPERT REPORT OF JOSEPH SERLETTI, M.D.


Dated: December 6, 2023

_____
Joseph Serletti, M.D.

1

At the request of counsel for Defendants Christine H. Rohde, M.D., Joseph P. Alukal, M.D., Jennie Rovano, R.N., The New York and Presbyterian Hospital, and The Trustees of Columbia University in the City of New York, I hereby submit the following expert report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

1. **Qualifications**: I am currently the Henry Royster-William Maul Measey Professor of Surgery and Chief of Plastic Surgery for the University of Pennsylvania. I currently oversee/direct 25 full time faculty, 21 Plastic Surgery residents, 6 post graduate fellows, and 3 research fellows. Penn Plastic Surgery spans over 100 miles from Virtua and Princeton in New Jersey to Lancaster, PA. We have one of the largest Microsurgery programs in the United States performing over 700 microsurgical procedures each year. I personally perform 100 or more microsurgical procedures each year. We have one of the largest Microsurgery fellowships in the country, training 5 fellows each year. I am Board Certified, and my certification is up to date by the American Board of Plastic Surgery. I am a former Director and past Chair of the American Board of Plastic Surgery. I am a member and past president of the American Society for Reconstructive Microsurgery, the preeminent society for surgeons performing microsurgical procedures. I am a member and current secretary of the American Association of Plastic Surgeons. The American Association of Plastic Surgeons is the most prestigious and exclusive society with American Plastic Surgery. I am in the presidential line and will be president of this Association in 2027. I am a member and past president of the American Council of Educators in Plastic Surgery, the Northeastern Society of Plastic Surgeons, and the Pennsylvania State Society of Plastic Surgeons (The Ivy Society). I am a member of the American Society of Plastic Surgeons (our parent organization) and recipient of their award, one of the highest awards bestowed by this society. I am also a recipient of the Clinician of the Year award from the American Association of Plastic Surgeons. This is one of the highest and most prestigious awards within all of Plastic Surgery. My Clinician of the Year lecture was on our contributions to making reconstructive microsurgery a routine procedure.

2. **Fees**: $1000 per hour for review, preparation, conference calls. $2500 for a deposition. $5000 for a half day courtroom testimony.

3. **Prior Expert Testimony**: What follows is my entire courtroom experience in expert testimony over approximately 25 years. I have no record of the names or dates of these events. Breast reduction case for the defense in Niagara Falls, NY; Head and Neck Cancer case for the defense in Albany, NY; Lower Extremity case for the defense in Camden, NJ, Breast Reconstruction case for the defense in Columbus, OH; Breast reconstruction case for the defense in Wheeling, WV; and IV infiltration case for the plaintiff in Providence, RI.

4. **Materials Considered in Preparing Report**: New York Presbyterian Inpatient Medical Records, Office Records of Dr. Joseph Aluklal, Office Records of Dr. Christine Rohde, Office Records of Dr. Irwin Goldstein, Deposition Transcripts of Dr. Alukal, Dr. Rohde and Dr. Jarrod Bogue.

5. **Factual Summary**: Mr. Kamal Ravikant was referred to Dr. Christine Rohde by urologist, Dr. Joseph Alukal, for consideration of penile revascularization. Dr. Rohde is a Plastic Surgeon who actively performs microsurgical procedures. The patient was referred to Dr. Rohde because of the need for microsurgical techniques in penile revascularization. Mr. Ravikant was initially seen by Dr. Rohde on 9-24-19. He presented with a 2.5 year history of erectile dysfunction. Pelvic angiography performed on 6-19-19 showed absence of right cavernosal and dorsal penile artery. The procedure for penile revascularization was reviewed with the patient during his initial consultation with Dr. Rohde. This included using the deep inferior epigastric artery with anastomosis to either the dorsal penile artery or vein. Possible complications were also reviewed and specifically included bleeding, graft failure, insufficient flow, and need for further procedures. On October 1, 2019, the patient underwent penile revascularization using the right inferior epigastric artery end to end into the right dorsal penile artery. The procedure was uneventful. On the morning of October 2nd, the patient was seen by Dr. Garcia-Saleem at 8:32am and was doing well with a positive Doppler signal and no hematoma. Later that day, a scrotal hematoma developed with a presumptive diagnosis of anastomotic disruption. The patient was urgently returned to the operating room for exploration and repair. During this second procedure, the anastomosis was disrupted. The distal dorsal penile artery was now deemed insufficient for direct anastomosis. It was determined to now revascularize the venous system through the dorsal vein of the penis (as discussed as a possible option during the patient's initial office visit). Because of a length discrepancy, a saphenous vein graft was harvested and used to perform the vascular reconstruction. The vein graft was anastomosed to the distal end of the inferior epigastric artery and the other end of the vein graft was anastomosed to the dorsal vein of the penis. Following this, there was a strong Doppler signal within the distal penis. The patient remained hospitalized until 10-7-19. From the time of the patient's second operative procedure to the time of discharge, his hospital course was uneventful. The patient was seen postoperatively by Dr. Rohde on 10-14-19, 10-21-19, and lastly on 11-11-19. On each postoperative outpatient visit, swelling improved and a Doppler signal was present indicating a successful vascular reconstruction. On the patient's last visit, it was noted that he specifically felt that there was improved blood flow within his penis. On 11-11-19, the patient was instructed to continue care with Dr. Akulal. The patient was discharged from Dr. Rohde's care.

6. **Statement of Opinions**: Penile revascularization is an uncommon, but well-recognized procedure within Reconstructive Microsurgery. The determination of whether the procedure is indicated in a patient is made by urology. As in this case, penile revascularization is commonly performed by both a urologist and Plastic Surgeon trained and/or actively practicing Reconstructive Microsurgeon. Revascularization is performed to either the dorsal penile artery or the dorsal vein of the penis. Direct arterial revascularization is a more technically difficult procedure, and hence arterializing the venous system through the dorsal vein of the penis is an accepted alternative. Mr. Ravikant was informed preoperatively of both of these techniques, and he was also informed preoperatively of the associated risks of this procedure which included bleeding, ugly scarring, graft failure, insufficient flow, priapism, hyperemia, and the need for further procedures.

3

The main role of Dr. Rohde during the October 1, 2019 penile revascularization procedure, was to connect the donor vessel to the recipient vessel in the penis. The inferior epigastric artery was an appropriate vessel to harvest, and is one of the most common in this type of procedure. The decision to then connect that donor artery to the right dorsal artery in the penis to receive the blood was appropriate. Here, Dr. Rohde appropriately connected the inferior epigastric artery to the right dorsal artery with 9-0 nylon sutures.

Dr. Rohde's mention of some initial tension at the anastomosis site in her operative report is not concerning as once the vessels were brought back into the penis and the penis was put back in its anatomic position, there was no tension on the vessels. In fact, all microsurgery anastomoses are sutured under some sort of tension to prevent kinking with the suturing. Once that is done, there is no tension. If the vessels are sutured while they are relaxed, there will be kinking and potential occlusion of the vessels. There was no undue tension or improper tension on the anastomosis here, nor did any tension ultimately cause the breakdown of the anastomosis. The anastomosis was also appropriately observed intraoperatively, to confirm that there were no clotting issues, no leaking, and no bleeding.

Post-operatively, it was also appropriate to advise the patient to get out of bed and walk, and there was no reason to place this patient on bed rest. The post-operative exams overnight were within the standard of care. Blood observed in the penile/scrotal incision area was normal and expected.

Ultimately, Mr. Ravikant suffered graft failure of the initial procedure the following morning on October 2, 2019, and required an additional procedure, and ultimately had a successful reconstruction using a vein graft and arterializing the venous system through the dorsal vein of the penis. This complication of graft failure was a known risk of the procedure, which Mr. Ravikant had been apprised of pre-operatively.

Specifically, on October 2, 2019, Dr. Rohde was called to Mr. Ravikant's bedside by a resident regarding the possibility of bleeding at the anastomosis site. Dr. Rohde arrived to bedside, and after assessing the patient, she appropriately obtained informed consent to take him back to the Operating Room emergently to address the bleed. She also discussed with Mr. Ravikant that there were two options for surgery – the first option was to go in and stop the bleeding only and the second option was to stop the bleeding and then try to salvage the revascularization, though she could not guarantee success with the salvage procedure. This was appropriate – once the emergent portion of the surgery concerning the bleeding was addressed, Dr. Rohde could appropriately proceed with efforts to salvage the revascularization on an elective basis at the patient's choosing. The patient here selected the second option, including the salvage procedure.

It was also appropriate for Dr. Rohde to take the lead during the October 2, 2019 surgery, given that Dr. Alukal was not at the hospital then. Dr. Rohde also notably asked the attending urologist at the Hospital then, Dr. Steven Brandes, to join her in the Operating Room to assist with identifying the penile anatomy until Dr. Alukal arrived shortly thereafter.

During the October 2, 2019 repair surgery, Dr. Rohde appropriately determined that she needed to obtain more length in the inferior epigastric artery for the repair procedure given damage which had occurred with the complication. This need for additional length was by no means an indication that not enough inferior epigastric artery length was obtained during the initial surgery on October 1, 2019. Rather, given that there was an anastomotic breakdown, Dr. Rohde had to resect the artery back to healthy tissue, and therefore needed more length in efforts to salvage the revascularization.

It was also appropriate for Dr. Rohde to select the saphenous vein graft from the patient's leg for the repair procedure on October 2, 2019. She then appropriately connected the inferior epigastric artery to the vein graft to the right dorsal vein in order to bring blood into the penis and to salvage the prior surgery. She used the graft in this case since she needed some more length in the area and the vein graft gave her length to make that connection, and also enabled her to dissect the shredded parts of the vessels that had torn, obtain fresh tissue, and connect them into a successful anastomosis.

Ultimately, tension did not cause the complication here. When the patient got out of bed, something could have occurred with the anastomosis unrelated to tension. An increase in blood pressure may have also caused the problem. The anastomosis here was sutured properly, but even with the best care, a suture can ultimately fail.

Follow up examinations postoperatively demonstrated positive Doppler signals within the penis proving a successful vascular reconstruction. Mr. Ravikant is said to have noted increased blood flow within his penis on his last follow up appointment with Dr. Rohde on 11-11-19.

There was absolutely no deviation in the standard of care on the part of Dr. Rohde throughout her entire care of Mr. Ravikant.

All of my opinions herein are rendered to a reasonable degree of medical certainty.

Dated: December 6, 2023

Joseph Serletti, M.D.

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

KAMAL RAVIKANT,

                        Plaintiff,

- against -                                   Civil Action No. 21-CV-04758

CHRISTINE H. ROHDE, M.D., JOSEPH P.        Hon. Magistrate Judge Ona T.
ALUKAL, M.D., JARROD BOGUE, M.D.,         Wang
COLUMBIA DOCTORS FACULTY
PRACTICE GROUP OF THE COLUMBIA
UNIVERSITY IRVING MEDICAL CENTER
AND THE NEW YORK AND
PRESBYTERIAN HOSPITAL,

                        Defendants.

--------------------------------------------------------------- x


**EXPERT REPORT OF JOSEPH SERLETTI, M.D.**


Dated: December 6, 2023

                                                                      Joseph Serletti, M.D.

At the request of counsel for Defendants Christine H. Rohde, M.D., Joseph P. Alukal, M.D., Jennie Rovano, R.N., The New York and Presbyterian Hospital, and The Trustees of Columbia University in the City of New York, I hereby submit the following expert report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

1. **Qualifications**: I am currently the Henry Royster-William Maul Measey Professor of Surgery and Chief of Plastic Surgery for the University of Pennsylvania. I currently oversee/direct 25 full time faculty, 21 Plastic Surgery residents, 6 post graduate fellows, and 3 research fellows. Penn Plastic Surgery spans over 100 miles from Virtua and Princeton in New Jersey to Lancaster, PA. We have one of the largest Microsurgery programs in the United States performing over 700 microsurgical procedures each year. I personally perform 100 or more microsurgical procedures each year. We have one of the largest Microsurgery fellowships in the country, training 5 fellows each year. I am Board Certified, and my certification is up to date by the American Board of Plastic Surgery. I am a former Director and past Chair of the American Board of Plastic Surgery. I am a member and past president of the American Society for Reconstructive Microsurgery, the preeminent society for surgeons performing microsurgical procedures. I am a member and current secretary of the American Association of Plastic Surgeons. The American Association of Plastic Surgeons is the most prestigious and exclusive society with American Plastic Surgery. I am in the presidential line and will be president of this Association in 2027. I am a member and past president of the American Council of Educators in Plastic Surgery, the Northeastern Society of Plastic Surgeons, and the Pennsylvania State Society of Plastic Surgeons (The Ivy Society). I am a member of the American Society of Plastic Surgeons (our parent organization) and recipient of their award, one of the highest awards bestowed by this society. I am also a recipient of the Clinician of the Year award from the American Association of Plastic Surgeons. This is one of the highest and most prestigious awards within all of Plastic Surgery. My Clinician of the Year lecture was on our contributions to making reconstructive microsurgery a routine procedure.

2. **Fees**: $1000 per hour for review, preparation, conference calls. $2500 for a deposition. $5000 for a half day courtroom testimony.

3. **Prior Expert Testimony**: What follows is my entire courtroom experience in expert testimony over approximately 25 years. I have no record of the names or dates of these events. Breast reduction case for the defense in Niagara Falls, NY; Head and Neck Cancer case for the defense in Albany, NY; Lower Extremity case for the defense in Camden, NJ, Breast Reconstruction case for the defense in Columbus, OH; Breast reconstruction case for the defense in Wheeling, WV; and IV infiltration case for the plaintiff in Providence, RI.

4. **Materials Considered in Preparing Report**: New York Presbyterian Inpatient Medical Records, Office Records of Dr. Joseph Aluklal, Office Records of Dr. Christine Rohde, Office Records of Dr. Irwin Goldstein, Deposition Transcripts of Dr. Alukal, Dr. Rohde and Dr. Jarrod Bogue.

5. **Factual Summary**: Mr. Kamal Ravikant was referred to Dr. Christine Rohde by urologist, Dr. Joseph Alukal, for consideration of penile revascularization. Dr. Rohde is a Plastic Surgeon who actively performs microsurgical procedures. The patient was referred to Dr. Rohde because of the need for microsurgical techniques in penile revascularization. Mr. Ravikant was initially seen by Dr. Rohde on 9-24-19. He presented with a 2.5 year history of erectile dysfunction. Pelvic angiography performed on 6-19-19 showed absence of right cavernosal and dorsal penile artery. The procedure for penile revascularization was reviewed with the patient during his initial consultation with Dr. Rohde. This included using the deep inferior epigastric artery with anastomosis to either the dorsal penile artery or vein. Possible complications were also reviewed and specifically included bleeding, graft failure, insufficient flow, and need for further procedures. On October 1, 2019, the patient underwent penile revascularization using the right inferior epigastric artery end to end into the right dorsal penile artery. The procedure was uneventful. On the morning of October 2nd, the patient was seen by Dr. Garcia-Saleem at 8:32am and was doing well with a positive Doppler signal and no hematoma. Later that day, a scrotal hematoma developed with a presumptive diagnosis of anastomotic disruption. The patient was urgently returned to the operating room for exploration and repair. During this second procedure, the anastomosis was disrupted. The distal dorsal penile artery was now deemed insufficient for direct anastomosis. It was determined to now revascularize the venous system through the dorsal vein of the penis (as discussed as a possible option during the patient's initial office visit). Because of a length discrepancy, a saphenous vein graft was harvested and used to perform the vascular reconstruction. The vein graft was anastomosed to the distal end of the inferior epigastric artery and the other end of the vein graft was anastomosed to the dorsal vein of the penis. Following this, there was a strong Doppler signal within the distal penis. The patient remained hospitalized until 10-7-19. From the time of the patient's second operative procedure to the time of discharge, his hospital course was uneventful. The patient was seen postoperatively by Dr. Rohde on 10-14-19, 10-21-19, and lastly on 11-11-19. On each postoperative outpatient visit, swelling improved and a Doppler signal was present indicating a successful vascular reconstruction. On the patient's last visit, it was noted that he specifically felt that there was improved blood flow within his penis. On 11-11-19, the patient was instructed to continue care with Dr. Akulal. The patient was discharged from Dr. Rohde's care.

6. **Statement of Opinions**: Penile revascularization is an uncommon, but well-recognized procedure within Reconstructive Microsurgery. The determination of whether the procedure is indicated in a patient is made by urology. As in this case, penile revascularization is commonly performed by both a urologist and Plastic Surgeon trained and/or actively practicing Reconstructive Microsurgeon. Revascularization is performed to either the dorsal penile artery or the dorsal vein of the penis. Direct arterial revascularization is a more technically difficult procedure, and hence arterializing the venous system through the dorsal vein of the penis is an accepted alternative. Mr. Ravikant was informed preoperatively of both of these techniques, and he was also informed preoperatively of the associated risks of this procedure which included bleeding, ugly scarring, graft failure, insufficient flow, priapism, hyperemia, and the need for further procedures.

The main role of Dr. Rohde during the October 1, 2019 penile revascularization procedure, was to connect the donor vessel to the recipient vessel in the penis. The inferior epigastric artery was an appropriate vessel to harvest, and is one of the most common in this type of procedure. The decision to then connect that donor artery to the right dorsal artery in the penis to receive the blood was appropriate. Here, Dr. Rohde appropriately connected the inferior epigastric artery to the right dorsal artery with 9-0 nylon sutures.

Dr. Rohde's mention of some initial tension at the anastomosis site in her operative report is not concerning as once the vessels were brought back into the penis and the penis was put back in its anatomic position, there was no tension on the vessels. In fact, all microsurgery anastomoses are sutured under some sort of tension to prevent kinking with the suturing. Once that is done, there is no tension. If the vessels are sutured while they are relaxed, there will be kinking and potential occlusion of the vessels. There was no undue tension or improper tension on the anastomosis here, nor did any tension ultimately cause the breakdown of the anastomosis. The anastomosis was also appropriately observed intraoperatively, to confirm that there were no clotting issues, no leaking, and no bleeding.

Post-operatively, it was also appropriate to advise the patient to get out of bed and walk, and there was no reason to place this patient on bed rest. The post-operative exams overnight were within the standard of care. Blood observed in the penile/scrotal incision area was normal and expected.

Ultimately, Mr. Ravikant suffered graft failure of the initial procedure the following morning on October 2, 2019, and required an additional procedure, and ultimately had a successful reconstruction using a vein graft and arterializing the venous system through the dorsal vein of the penis. This complication of graft failure was a known risk of the procedure, which Mr. Ravikant had been apprised of pre-operatively.

Specifically, on October 2, 2019, Dr. Rohde was called to Mr. Ravikant's bedside by a resident regarding the possibility of bleeding at the anastomosis site. Dr. Rohde arrived to bedside, and after assessing the patient, she appropriately obtained informed consent to take him back to the Operating Room emergently to address the bleed. She also discussed with Mr. Ravikant that there were two options for surgery – the first option was to go in and stop the bleeding only and the second option was to stop the bleeding and then try to salvage the revascularization, though she could not guarantee success with the salvage procedure. This was appropriate – once the emergent portion of the surgery concerning the bleeding was addressed, Dr. Rohde could appropriately proceed with efforts to salvage the revascularization on an elective basis at the patient's choosing. The patient here selected the second option, including the salvage procedure.

It was also appropriate for Dr. Rohde to take the lead during the October 2, 2019 surgery, given that Dr. Alukal was not at the hospital then. Dr. Rohde also notably asked the attending urologist at the Hospital then, Dr. Steven Brandes, to join her in the Operating Room to assist with identifying the penile anatomy until Dr. Alukal arrived shortly thereafter.

During the October 2, 2019 repair surgery, Dr. Rohde appropriately determined that she needed to obtain more length in the inferior epigastric artery for the repair procedure given damage which had occurred with the complication. This need for additional length was by no means an indication that not enough inferior epigastric artery length was obtained during the initial surgery on October 1, 2019. Rather, given that there was an anastomotic breakdown, Dr. Rohde had to resect the artery back to healthy tissue, and therefore needed more length in efforts to salvage the revascularization.

It was also appropriate for Dr. Rohde to select the saphenous vein graft from the patient's leg for the repair procedure on October 2, 2019. She then appropriately connected the inferior epigastric artery to the vein graft to the right dorsal vein in order to bring blood into the penis and to salvage the prior surgery. She used the graft in this case since she needed some more length in the area and the vein graft gave her length to make that connection, and also enabled her to dissect the shredded parts of the vessels that had torn, obtain fresh tissue, and connect them into a successful anastomosis.

Ultimately, tension did not cause the complication here. When the patient got out of bed, something could have occurred with the anastomosis unrelated to tension. An increase in blood pressure may have also caused the problem. The anastomosis here was sutured properly, but even with the best care, a suture can ultimately fail.

Follow up examinations postoperatively demonstrated positive Doppler signals within the penis proving a successful vascular reconstruction. Mr. Ravikant is said to have noted increased blood flow within his penis on his last follow up appointment with Dr. Rohde on 11-11-19.

There was absolutely no deviation in the standard of care on the part of Dr. Rohde throughout her entire care of Mr. Ravikant.

All of my opinions herein are rendered to a reasonable degree of medical certainty.

Dated: December 6, 2023

_____
Joseph Serletti, M.D.