**DECLARATION OF RICHARD C. VASQUEZ IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. STANTON C. HONIG AND DR. JOSEPH SERLETTI**

# EXHIBIT: 3

```
                                                          1
                       K. Ravikant
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------x
KAMAL RAVIKANT,

              Plaintiff(s),    Civil Action No.
                                 21-CV-04758
      -against-

CHRISTINE H. ROHDE, JOSEPH P. ALUKAL, JARROD
BOUGE, COLUMBIA DOCTORS FACULTY PRACTICE GROUP
OF THE COLUMBIA UNIVERSITY IRVING MEDICAL
CENTER, THE NEW YORK AND PRESBYTERIAN
HOSPITAL, JENNIE ROVANO, COLUMBIA DOCTORS
MEDICAL GROUP,

                       Defendant(s).
----------------------------------------------x
                     (VIA ZOOM)


                     November 8, 2022
                     11:14 a.m.


      DEPOSITION of KAMAL RAVIKANT, the

Plaintiff, by the Defendants in the

above-entitled action, held at the above time

and place, pursuant to Order, taken before

SANDRA BRUZZESE, a shorthand reporter and

Notary Public within and for the State of New

York.
```



Reporter's Ink, Corp.    Phone: 646.395.2522    Fax: 212.374.1236    www.reporters-ink.com

```
                                            2
 1                  K. Ravikant
 2   A P P E A R A N C E S:
 3
 4      VASQUEZ BENISEK & LINDGREN, LLP
            Attorneys for Plaintiff(s)
 5          1550 Parkside Drive, Suite 130
            Walnut Creek, California 94596
 6
        BY:  RICHARD VASQUEZ, ESQ.
 7             -and-
             ERIC BENISEK, ESQ.
 8           RVASQUEZ@VBLLAW.COM
 9      LEAV & STEINBERG, LLP
            Local Attorneys for Plaintiff(s)
10          75 Broad Street
            New York, New York 10004
11
12      BY:  (NOT PRESENT)
13
        THE LAW OFFICE OF MARC ZIMMERMAN
14          Co-Counsel for Plaintiff(s)
            2000 Crystal Springs Road
15          San Bruno, California 94066
16      BY:  (NOT PRESENT)
17
        AARONSON RAPPAPORT FEINSTEIN &
18      DEUTSCH, LLP
            Attorneys for Defendant(s)
19          600 Third Avenue
            New York, New York 10016
20
        BY:  NANOR BAHADURIAN, ESQ.
21           FILE NO.  150.637
             NLTBAHADURIAN@ARFDLAW.COM
22
23
24
                  xxxxx
25
```

```
                                            3
 1                  K. Ravikant
 2           S T I P U L A T I O N S
 3
 4        IT IS HEREBY STIPULATED AND AGREED by
 5   and between the attorneys for the respective
 6   parties herein, that filing, sealing and
 7   certification, and the same are, hereby
 8   waived.
 9
10        IT IS FURTHER STIPULATED AND AGREED
11   that all objections except as to the form of
12   the question, shall be reserved to the time of
13   the trial.
14
15        IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be signed and
17   sworn to by an officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22                  xxxxx
23
24
25
```

```
                                            4
 1                  K. Ravikant
 2        THE COURT REPORTER:  Before I swear
 3   in the witness, I will ask Counsel to
 4   stipulate on the record that I may
 5   swear in the deponent even though I am
 6   not in the physical presence of the
 7   deponent, and that there is no
 8   objection to that at this time, nor
 9   will there be an objection to it at a
10   future date.
11        So stipulated, Counsel?
12        MR. VASQUEZ:  So stipulated.
13        MS. BAHADURIAN:  So stipulated.
14        THE COURT REPORTER:  Thank you.
15        Mr. Vasquez, will you be ordering a
16   copy of your witness' transcript?  If
17   you are, I would need your verbal
18   confirmation on the record.
19        MR. VASQUEZ:  Yes, I will be.
20        THE COURT REPORTER:  Thank you.
21             xxxxx
22
23
24
25
```

```
                                            5
 1                  K. Ravikant
 2        K A M A L   R A V I K A N T, the witness
 3   herein, having been first duly sworn before
 4   a Notary Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION
 7   BY MS. BAHADURIAN:
 8        Q.  Please state your name for the
 9   record.
10        A.  Kamal Ravikant.
11        Q.  State your address for the record,
12   please.
13        A.  222 Karen Avenue, Apartment 3301,
14   Las Vegas, Nevada 89109.
15        Q.  Good morning, Mr. Ravikant.  My name
16   is Nanor Bahadurian.  I'm from the law firm
17   of Aaronson, Rappaport, Feinstein and
18   Deutsch.  We represent the defendants, Dr.
19   Christine Rohde, Dr. Joseph Alukal, Dr.
20   Jarrod Bogue, Nurse Jennie Rovano, The New
21   York and Presbyterian Hospital, and the
22   Trustees of Columbia University in this
23   action.
24          I'm going to be asking you a series
25   of questions today.  Please listen to my
```



**Page 186**

K. Ravikant

Q. How did you get there from the hospital?
A. Uber.
Q. Did anyone accompany you during that ride home?
A. No.
Q. Were you able to walk at all at the time you were discharged from the hospital?
A. Yes. Very -- it was very -- I couldn't walk for the first two days. After that, we started having a nurse just take me for a brief walk up the hallway. I remember the victory of up and down the hallway daily. And then I remember the victory of a couple of days later, being able be to turn around in the hallway. But it was always with a nurse holding me up.
    This one, when I left, I did walk to the elevator. I made it to the elevator, and I remember I was sweating and I was grabbing the back of those -- you know in elevators, they have those bars, like, and I remember grabbing those and pulling myself up. Yeah, so I was able to walk, and I walked out.

**Page 187**

K. Ravikant

Q. Did any medical provider tell you that you should limit your activity in any way at the time of discharge?
A. I remember speaking with Dr. Alukal about -- my whole thing was when will I recover, when will I recover? Because originally, the laparoscopic -- he had told me it would just take a few days and then I wanted to go to the gym. But he would not -- he made my wait for two or three weeks.
    But this one, there was no -- repeat the question again, please? I'm sorry. I'm rambling.
Q. Did any medical provider tell you there were any limitations on activity at the time of discharge?
A. I think I had a nurse, the discharge nurse, read me a lot of stuff. She was taking out my IVs and stuff like that, and there were a hundred pages of forms to sign.
Q. Do you recall signing any forms before the initial surgery with Dr. Alukal?
A. Before, like, what day?
Q. Before you underwent the October 1st

**Page 188**

K. Ravikant

surgery.
A. I remember having to sign some electronic forms when I showed up to the hospital that day, at reception. I remember -- I'm pretty sure I had to sign something for Dr. Rohde. Those are what I remember.
Q. Do you recall what it is that you signed?
A. No.
Q. Do you recall the purpose of the documents you signed?
    MR. VASQUEZ: Objection. Vague.
    THE WITNESS: Do I understand --
    MR. VASQUEZ: If you understand the question.
A. Say the question again.
Q. Do you recall the purpose of the documents you signed?
A. I recall the purpose being -- my assumption of the purpose being this is all consent, all the consent paperwork you sign to have surgery.
Q. What do you understand consent paperwork to be?

**Page 189**

K. Ravikant

A. I understand it to be the very same as the same consent paper -- the form I sign when I update my IOS on my iPhone. This is ever possibly thing that can -- for liability.
Q. Do you recall every possible thing that was listed on the consent forms that you signed before the October 1st surgery with Dr. Alukal?
    MR. VASQUEZ: Objection to form.
    THE WITNESS: Do I answer?
    MR. VASQUEZ: If you understand the question.
A. Repeat the question.
Q. Do you recall every possible -- you compared those forms to the IOS form that you sign, and you said that both those forms contain every possible thing that could happen.
    Is that accurate?
    MR. VASQUEZ: Objection to form.
A. That's an assumption I have, yes.
Q. The assumption that the forms list every possible thing that could happen, what

190

K. Ravikant

do you recall was listed on the firms that you signed in advance of the October 1st surgery with Dr. Alukal as being possible things that could happen?

A. I don't recall what was on the form. You can pull up the form if you want.

Q. When you arrived home and you were able to walk, did you have anyone assisting you at home after your discharge?

A. I had a nursing service come daily to check the bandages, to buy things for me from Walgreens, buy food for me. Pick up things for me. Change the bandages every day, I think, for, like, a week.

Q. Do you recall what nursing service that was?

A. No.

Q. Did you hire them through the hospital, or somewhere else?

A. Somewhere else.

Q. Where else, if you know?

A. I'm guessing I looked online.

Q. After that one week, did you have anyone coming to your apartment to help you

191

K. Ravikant

out with day-to-day activities in any way?

A. No.

Q. Were you on any pain medications at the time you arrived home following your hospital admission?

A. Yes.

Q. What pain medications were you on at that time?

A. I don't remember the name, but they were opioids, narcotics. Whatever they give you.

Q. How long were you on the opioids or the narcotics?

A. Significantly -- I mean, obviously in the hospital I was on IV and oral, like, every hour and a half, I believe. When I came home, I think I was on them for a couple of weeks, and then I kept some for a few occasions here and there.

Q. When you came off of them, did you have any pain?

A. A lot.

Q. Why did you come off of the pain medications if you still had pain?

192

K. Ravikant

A. It's something Dr. Alukal and I also discussed. I think I did some -- I did a video, and I don't remember if it was during that time. It was. Because when I was on opioids, when I got back, I did a video that I posted on Instagram called "Kamal on narcotics" or "Kamal on opioids," where I talked about the experience. But I was full-on on opioids.

And I'm using the term "opioids" because I don't remember if it was OxyContin or was it -- it was one of those. I just remember talking about the blood spraying when it burst and all of that, and I remember thinking it was a good idea at the time. And then a reader, a long-time reader of mine reached out to me and she was very upset, and she said this is disrespectful to people who have opioid addictions. And I remember reading that and thinking, oh, my God, what am I doing? I'm not thinking straight. She is so right. I would never in my right mind do this. I'm not thinking right on these things.

193

K. Ravikant

And two, at a certain point, what I discovered with these pain meds was that one of these things they do is they make you not care about the pain. Even if you feel it, you sort of stop caring about it. And I had stopped caring. And I was, like, oh, my God, this is why addiction happens. If you are going through anything horrible and you don't care -- and I could see my mind starting to like it, and I am not going to put myself into something worse than I already am. I immediately started tapering them off, no matter how -- and just dealt with the pain. I used ice for pain instead. A lot of ice.

Q. Did you find that the ice relieved your pain?

A. It helped a lot.

Q. Did you --

A. I had big bags of ice. I'm sorry.

Q. Keep going.

A. It was constant rotation of big bags of ice around my scrotum.

Q. You mentioned you traveled twice in 2019. When was that?

242

K. Ravikant
first one, and I believe that was at night.
It felt like night.
   Q.  Did she talk to you at all about the
second surgery, or only the first?
   A.  Only the first.  The sense I got was
she was present for the first.  She was doing
rounds.  She was the urology resident.
      And I remember Dr. Rohde coming once
I was up on my actual floor in my actual
room, coming with a lot of residents.  And I
remember a lot of residents coming and going
back and forth.
      The question is, did any of them
speak to me about the second surgery?
   Q.  Yes, but if you have information
about the first surgery, as well, I --
   A.  Okay.  I remember Dr. Bogue.  He was
-- he described it -- because he was part of
-- he was Dr. Rohde's chief resident, I
believe.  And no one described to me in
detail, I believe, what happened.  Also, keep
in mind I was on severe pain medication, IV
and oral, for those first few days,
especially.  So I know doctors came and saw

243

K. Ravikant
me.  Dr. Rohde came at least once or twice.
I remember a lot of residents came and I
remember Dr. Alukal.  But I don't remember
people telling me about the second surgery.
   Q.  Did you ever learn what was done
during the second surgery?
   A.  Yes.  I remember having that
knowledge when I was in the hospital.
   Q.  Do you remember how you obtained
that knowledge?
   A.  I don't remember.
   Q.  What knowledge did you have about
the second surgery while you were at New York
Presbyterian?
   A.  That they had stopped the bleeding
and then -- and taken the artery and hooked
it up to the main vein in the penis.
   Q.  Where was the artery from, if you
know?
   A.  It was the same artery that was
taken from the original surgery.
   Q.  Did you ever find out why Dr. Rohde
was pointing to the calf before the second
surgery?

244

K. Ravikant
   A.  I found out after.  Not before.
   Q.  She was pointing to the calf before
the surgery; right?
   A.  She was gesturing towards it, and I
remember thinking, why are you gesturing to
my calf?
   Q.  Did you ever find out why?
   A.  Yes.
   Q.  What did you find out?
   A.  This is after I woke up from the
second surgery; correct?
   Q.  Yes.  Whenever you found out.
   A.  They took a vein and grafted it onto
-- they basically made a connection between
the vein in the penis and then the original
artery from my abdomen, and that was --
that's what they took the vein for.
   Q.  Where did they take the vein from,
for the graft?
   A.  My left calf.
      MS. BAHADURIAN:  Off the record.
      (Whereupon, a discussion was
   held off the record.)
      MS. BAHADURIAN:  We are meeting

245

K. Ravikant
tomorrow at 8:00 a.m. Pacific standard
time, and proceeding with a full day
tomorrow.
   (Time noted:  7:23 p.m.)



```
                                                246
 1                K. Ravikant
 2          A C K N O W L E D G M E N T
 3      I, KAMAL RAVIKANT, hereby certify that I
 4   have read the transcript of my testimony taken
 5   under oath on November 8th, 2022, that the
 6   transcript is a true, complete and correct
 7   record of what was asked, answered and said
 8   during my testimony under oath, and that the
 9   answers on the record as given by me are true
10   and correct.
11
12
13
14   _____
15   KAMAL RAVIKANT
16
17   Signed and subscribed to
18   before me, this _____ day
19   of _____, _____.
20
21   _____
22   Notary Public
23
24
25
```

```
                                                247
 1                K. Ravikant
 2                  INDEX
 3
     WITNESS        EXAMINATION BY        PAGE
 4
 5   K. Ravikant    Ms. Bahadurian        5
 6
 7
 8        QUESTIONS MARKED FOR RULINGS
 9                   72
10                  120
```

```
                                                248
 1                K. Ravikant
 2           C E R T I F I C A T E
 3      I, SANDRA BRUZZESE, a shorthand
 4   reporter and Notary Public within and for the
 5   State of New York, do hereby certify:
 6         That the witness(es) whose testimony
 7   is hereinbefore set forth was duly sworn by
 8   me, and the foregoing transcript is a true
 9   record of the testimony given by such
10   witness(es).
11         I further certify that I am not
12   related to any of the parties to this action
13   by blood or marriage, and that I am in no way
14   interested in the outcome of this matter.

                    SANDRA BRUZZESE
```

```
                                                249
 1                K. Ravikant
 2           C E R T I F I C A T E
 3      I, MARCI GLOTZER, a shorthand reporter
 4   and Notary Public within and for the State of
 5   New York, do hereby certify:
 6         That the witness(es) whose testimony
 7   is hereinbefore set forth was duly sworn by
 8   me, and the foregoing transcript is a true
 9   record of the testimony given by such
10   witness(es).
11         I further certify that I am not
12   related to any of the parties to this action
13   by blood or marriage, and that I am in no way
14   interested in the outcome of this matter.

                    MARCI GLOTZER
```

