UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KAMAL RAVIKANT,

                       Plaintiff,

        v.

CHRISTINE H. ROHDE, MD et al.,

                       Defendants.

21 Civ. 4758 (DEH) (OTW)

**OPINION AND ORDER**

---

DALE E. HO, United States District Judge:

Plaintiff Kamal Ravikant ("Plaintiff" or "Mr. Ravikant") brings this action against Defendants Christine H. Rohde, MD, Joseph P. Alukal, MD, Columbia Doctors Faculty Practice Group of the Columbia University Irving Medical Center, the New York and Presbyterian Hospital, and Columbia Doctors Medical Group (collectively, "Defendants"), alleging various claims including medical malpractice, negligence, misrepresentation, and lack of informed consent related to a urologic vascular surgery performed on Mr. Ravikant at the New York and Presbyterian Hospital on October 1 and October 2, 2019. *See* Am. Compl., ECF No. 48.

Before the Court is the August 21, 2025 Report and Recommendation (the "Report" or "R. & R.") recommending that Defendants' Motion to Exclude Plaintiff's Economic Experts ("Defs.' Mot."), ECF No. 143, and Plaintiff's Motion to Exclude Defendants' Medical Experts ("Pl.'s Mot."), ECF No. 145, be denied. *See* R. & R., ECF No. 157. For the reasons stated below, the Report and is **ADOPTED IN PART**. Specifically, the Court adopts the portion of the Report recommending that this Court deny Mr. Ravikant's motion to exclude the testimony of Defendants' medical experts. But for the reasons stated herein, the Court **SUSTAINS** Defendants' objections to the portion of the Report recommending that this Court deny Defendants' motion to exclude the testimony of Mr. Ravikant's experts, and **GRANTS** the motion.

## BACKGROUND

Familiarity with the factual background and relevant procedural history of this case as set out in the Report is assumed. *See* R. & R. at 1-3. This action is assigned to Magistrate Judge Wang for general pretrial supervision and for dispositive motions. *See* ECF No. 7. On August 21, 2025, Magistrate Judge Wang issued the Report. On September 4, 2025, Defendants filed their Objection to the Report. *See* Defs.' Obj. to R. & R. ("Defs.' Obj."), ECF No. 159. On September 18, 2025, Mr. Ravikant filed his Memorandum of Law in Opposition to Defendants' Objection. *See* Pl.'s Opp'n to R. & R. ("Pl.'s Opp'n"), ECF No. 160. After reviewing the Report, the Defendants' Objection, and Mr. Ravikant's Opposition, the Court adopts the Report in part.

## LEGAL STANDARDS

### I.      Standard of Review for a Report and Recommendation

When reviewing a Report and Recommendation, a court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."[1] 28 U.S.C. § 636(b)(1)(C). For dispositive matters, a district judge is required to "determine *de novo* any part of the magistrate judge's disposition that has been properly objected to" by any party. Fed. R. Civ. P. 72(b)(3). For those portions to which no proper objection is made, a district court need only satisfy itself that there is no "clear error on the face of the record." *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 n.4 (2d Cir. 2022).

When a party has not properly made objections, for instance, by making "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers, it] will not suffice to invoke *de novo*

---

[1] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

review." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 313 (S.D.N.Y. 2009). Accordingly, when a court is considering objections that "merely re-assert arguments already submitted to the Magistrate Judge, this Court need only review the Report and Recommendation for clear error." *Id.*; *see also Pinkney v. Progressive Home Health Servs.*, No. 00 Civ. 7487, 2008 WL 2811816, at *1 (S.D.N.Y. July 21, 2008) ("To the extent, however, that the party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report strictly for clear error . . . . [N]o party [should] be allowed a 'second bite at the apple' by simply relitigating a prior argument."); *Vega v. Artuz*, No. 97 Civ. 3775, 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002) (noting that if the district court engaged with objections that are "general and conclusory [this] would reduce the magistrate's work to something akin to a 'meaningless dress rehearsal'").

## II. Admissibility of Expert Opinion Testimony

The district court is "the ultimate 'gatekeeper'" of expert testimony, *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007), and must ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The court must determine the admissibility of expert opinion testimony under Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

In assessing reliability, a court should consider, among other factors, (1) whether the expert's theory "can be (and has been) tested;" (2) whether the theory "has been subjected to peer review

3

and publication;" (3) the "known or potential rate of error;" (4) whether the theory has "widespread acceptance," (5) whether an expert's opinion was developed for litigation, and (6) whether the expert has accounted adequately for obvious alternative explanations. *See, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 420 (S.D.N.Y. 2005).

"The proponent of the testimony has the burden to show that it is relevant and reliable and must do so by a preponderance of the evidence." *Faulkner v. Nat'l Geographic Soc'y*, 576 F. Supp. 2d 609, 619 (S.D.N.Y. 2008). If an expert opinion is based on "data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). Nevertheless, the court should apply "a presumption of admissibility of evidence," *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995); thus, "[i]n a close case, a court should permit the testimony to be presented at trial, where it can be tested by cross-examination and measured against the other evidence in the case," *Lippe v. Bairnco Corp.*, 288 B.R. 678, 700 n.6 (S.D.N.Y. 2003).

## DISCUSSION

### I. Mr. Ravikant's Motion to Exclude Defendants' Economic Experts

Mr. Ravikant did not file timely objections to the portion of the Report recommending that his motion to exclude Defendants' medical experts be denied, *see* R. & R. at 5-12. Nevertheless, the Court has carefully reviewed that portion of the Report and has found no error, clear or otherwise, and accordingly adopts it. *See Miller*, 43 F.4th at 120 n.4. For the reasons stated in the Report, Mr. Ravikant's motion is **DENIED**.

### II. Defendants' Motion to Exclude Mr. Ravikant's Economic Experts

Defendants raise various objections to the portion of the Report recommending that their motion to exclude Mr. Ravikant's economic experts be denied, *see* R. & R. 13-17. The Report

4

describes Mr. Ravikant's expert testimony in detail, *see* R. & R. at 13-14, so the Court only briefly summarizes it here.[2] Mr. Ravikant's experts presented two estimates as to his economic damages. In their first method (the "carried interest method"), they estimated, based on Mr. Ravikant's first and only previous venture fund, how much money he would have raised for his new venture fund and identified a portfolio of companies in which he would have likely invested. *Id.* at 13. They did this by "assum[ing] that [Mr. Ravikant] . . . would have been able to make investments in a list of companies that [his brother Naval] invested in during [his period of incapacitation]," and also by assuming that he would have invested 20% of the amount that his brother invested into these companies, because that is what he would "typically" do. Expert Report of Brent Reynolds and Walter Bratic ¶ 41, ECF 143-2. Mr. Ravikant's experts then determined the difference between the value of those investments at that time and their current market value and then calculated the present value of his carried interest fee, which they determined to be approximately $2.8 million. *See id.* ¶¶ 51-55. In their second method (the "internal rate of return method"), Mr. Ravikant's experts started by estimating the amount of capital he would have raised and then applied a 17% rate of return based on the performance of his prior fund. *See id.* ¶ 60. Using this method, they arrived at an estimate of $1.3 million in lost compensation. *See id.* ¶ 62.

Defendants object to the Report's recommendation that their motion to exclude this testimony be denied, arguing:

> [Mr. Ravikant's experts'] methodologies are unreliable because (1) the valuations of the purported missed venture capital opportunities were only based upon one point in time, and not what actual profit, if any, they would actually derive for the fund; and (2) the rate of return applied from plaintiff's first fund from several years

---

[2] Defendants do not challenge the qualifications of Mr. Ravikant's experts, and the Court finds no error, clear or otherwise, in the Report's conclusion that they are qualified to be experts under Rule 702. *See* R. & R. at 13 n.6; *see also Miller*, 43 F.4th at 120 n.4.

5

> before concerned different venture capital investments and concerned a different time and different climate (notably not during a global pandemic).

Defs.' Obj. at 2. In support of their arguments, Defendants cite *Crawford v. Franklin Credit Mgmt. Corp.*, 08 Civ. 6293, 2015 WL 13703301, at *7-8 (S.D.N.Y. Jan. 22, 2015), which excluded an expert opinion that calculated damages based on a plaintiff's anticipated graduation from medical school, and the lost wages that she purportedly would have earned as a doctor. There, the court explained:

> This testimony must be precluded because it is based on too many questionable assumptions, which in combination, render Smith's testimony "speculative" and "conjectural." Smith's testimony on Crawford's allegedly lost wages is based on a chain of connected assumptions. Smith first assumes that, but for Defendants' actions, Crawford would have graduated from medical school on time. He next assumes that after graduation, she would have been able to pass her licensure exam. He then concludes that a licensed and accredited Crawford would have been able to find employment as a general practitioner. Smith provides no authority for this final contention. He does not account for the quality of Crawford's medical school, for the employment rates of students who graduate from that school, or for whether Crawford's age or grades might have affected her employment opportunities. Instead, Smith merely assumes that Crawford would have found employment based on his assertion that there was at that time "a shortage of physicians in the U.S.," that "the shortage is even more acute in primary care because most physicians want to earn the extra money that comes from a specialty," and that this shortage is "about to become extremely exacerbated as a result of the recent healthcare bill."

*Crawford*, 2015 WL 13703301, at *7.

After carefully considering that parties' arguments and the reasoning in the Report, the Court sustains Defendants' objections. As in *Crawford*, Mr. Ravikant's experts here base their estimate on multiple layers of unfounded dependent assumptions. First, just as the *Crawford* expert assumed that the plaintiff there would have successfully graduated from medical school and passed a licensure exam, here Mr. Ravikant's experts assume that he would have succeeded in raising a certain amount of capital for his fund (despite the fact that he established the fund years earlier and had essentially "left it at a standstill while he pursued other endeavors," Defs.' Obj. at 2). Next, just as the *Crawford* expert assumed that, upon graduation and licensing, the plaintiff

6

would have been able to find employment as a general practitioner, Mr. Ravikant's experts here assume that upon raising funds, Mr. Ravikant would have invested them in a particular portfolio of companies. And, just as the *Crawford* expert did not account for the plaintiff's grades or the quality of her school but rather assumed that they would be sufficient to obtain employment at a particular salary, here, Mr. Ravikant's experts' "internal rate of return method" assumed that Mr. Ravikant's rate of return on his second fund would be the same as that of his first one. *Id.* But Mr. Ravikant's experts made this assumption without taking into account that the second fund's hypothetical portfolio "concerned different venture capital investments and concerned a different time and different climate (notably not during a global pandemic)." *Id.* And Mr. Ravikant's experts simply ignore the fact that any profit (and thus, any income) from these hypothetical investments would "only [be] derived after the companies invested in actually reach an 'exit point' (i.e. an acquisition or initial public offering ('IPO') which can take years (often 10+)," a point that Mr. Ravikant's experts "notably concede . . . ." *Id.* at 1-2. Put another way, whatever the market value of these hypothetical investments is now, actual profits, if any, would likely not be realized from them until years down the line—and of course, many things can change in the interim.

Mr. Ravikant contends, and the Report found, that his experts' estimates are sufficiently reliable for *Daubert* purposes because they are based on empirical results—*i.e.*, the returns that he actually obtained in his first fund. *See* Pl.'s Opp'n to Def.'s Obj. to R. & R. ("Pl.'s Opp'n") at 5-6, ECF No. 160; R. & R. at 16-17. But that is not the same kind of certainty as a situation where a plaintiff earned a particular set wage in the past, which could be projected into the future (perhaps with adequately substantiated adjustments such as anticipated raises). Here, there are simply too many variables (some of which depend on others) to assume that Mr. Ravikant would have been able to raise funds to the same degree, would have made the same kinds of investment decisions, and would have achieved results similar to those he obtained through his first fund (a sample size

of one). "Although reliance on a single, reasonable assumption, by itself, might go only to weight, and not admissibility, . . . in combination, these numerous, dependent assumptions render [an expert's] testimony with respect to lost wages speculative and thus inadmissible." *Crawford*, 2015 WL 13703301, at *8; *see also Faulkner*, 576 F. Supp. 2d at 618-19 (holding an expert's testimony inadmissible because his methodology started with an "unsubstantiated assumption" and proceeded by relying on "nothing more than guesses"). For his part, Mr. Ravikant cites no cases holding similar testimony admissible under *Daubert*. As the proponent of expert testimony, Mr. Ravikant bears the burden of demonstrating its admissibility, and for the reasons set forth above, the Court concludes that he has failed to do so.

Mr. Ravikant cites two cases for the general proposition that objections to an expert's assumptions generally go to weight rather than admissibility. *See* Pl.'s Opp'n at 7. Both cases are inapposite. First, in *Dover v. Brit. Airways, PLC (UK)*, 254 F. Supp. 3d 455, 461 (E.D.N.Y. 2017), the court rejected a challenge to an expert's opinion that British Airway's fuel surcharges and actual fuel prices lack a close relationship based on the expert's failure to employ a regression analysis. Instead, the expert used a quarter-by-quarter comparison of British Airway's fuel surcharges and actual fuel prices, which the court deemed "a reasonable and sufficiently reliable method of assessing the relationship" between the two. *Id.* The expert's method in *Dover* was based on multiple empirical data points, to draw a correlation between two values. By contrast, here, Mr. Ravikant's experts based their estimates on his success with one previous venture fund, and, as explained above, employed multiple dependent assumptions in performing their calculations.

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015), is also unavailing. There, the plaintiff relied on an expert who performed a "yardstick" analysis, which sought to measure the value of a lost economic opportunity based on the value of a different business venture

that, in the expert's opinion, was "as *nearly* identical to the plaintiff's as possible." *Id.* at 315 (emphasis in original). The court deemed the proffered yardstick analysis sufficiently reliable for *Daubert* purposes based on numerous similarities between the plaintiff's venture and the proposed "yardstick" comparator, including (but not limited to): (1) that they were in the same business (the sale of compression sportswear) and both in the "early startup period," with similar growth potential; (2) multiple similarities between the arrangement at issue and the "yardstick" comparator, including "the geographical reach and cultural influence of MTV," which had agreed to serve as a promotional partner in the venture, and whose reach was analogous to that of ESPN, which served as a partner in the comparator venture; (3) the manufacturing capacity and industry relationships of the defendant; and (4) the similarities between the way in which the respective products were "marketed and the marketing tactics anticipated." *Id.* at 314, 316. Additionally, the expert considered "a number of underlying documents, including, *inter alia*, various SEC financial disclosure statements," "profit-and-loss statements," "and numerous accounting and valuation secondary sources" for the relevant entities. *Id.* at 316. Under these circumstances, the court held that questions as to the validity of the analogy between the venture at issue and the "yardstick" comparator, went to weight and were properly left to the factfinder, rather than to admissibility. But the analysis performed in *Washington* was much more in-depth than the comparatively more perfunctory analysis performed here, in which Mr. Ravikant's experts essentially mechanically assumed that, with his new venture, he would replicate his past fundraising success and the profitability of his first one.[3]

---

[3] Mr. Ravikant also argues that "Defendants are estopped by their prior briefing from now arguing that a qualified expert's reliance on past history and post-injury earnings is speculative," Pl.'s Opp'n at 7, but he does not explain how principles of "estoppel" should preclude the Court's consideration of Defendants' objections.

Accordingly, Defendants' objections to this portion of the Report are sustained, and the Court grants their motion to exclude the testimony of Mr. Ravikant's economic expert witnesses.

## CONCLUSION

For the reasons given above, the Report is **ADOPTED IN PART.** For the reasons stated in the Report, Plaintiff's Motion to Exclude Defendants' Medical Experts, ECF No. 145, is **DENIED**. However, for the reasons stated above, Defendants' Motion to Exclude Plaintiff's Economic Experts, ECF No. 143, is **GRANTED**.

Within **two weeks of the date of this Order**, the parties shall submit a status letter indicating whether either side intends to file a dispositive motion. If so, the letter shall include a proposed briefing schedule. If neither side intends to file a dispositive motion, the letter shall state the parties' availability for trial during the months of April, May, and June 2026, along with an estimate of the length of trial. Finally, the letter shall also state whether the parties believe that a referral for mediation through the District's mediation program, or to Magistrate Judge Wang for a settlement conference, would be appropriate.

The Clerk of Court is respectfully requested to terminate ECF Nos. 143 and 145.

SO ORDERED.

Dated: September 25, 2025
       New York, New York

_____
DALE E. HO
United States District Judge
